**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **KARL TARTT and CEDRIC JENNINGS,** | ) | |
| **Individually and on behalf of all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:09-01179** |
| | ) | **Judge Sharp** |
| **WILSON COUNTY, TENNESSEE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

Two Rutherford County residents – one who never applied for a position, and the other who applied for a position that may already have been filled – seek to represent a class of "all African Americans, past, present and future, who have been or will be discriminated against because of their race by Defendant Wilson County in opportunity, hiring, pay, initial placement, or promotion or who have been denied opportunity, hiring pay, initial placement or promotion with Wilson County due to the subjective and arbitrary employment practices." (Docket No. 18, Second Amended Complaint ¶ 92(a)). For the following reasons, Plaintiffs' Motion for Class Certification (Docket No. 64) will be denied.

## I.  GENERAL BACKGROUND

According to the allegations in the Second Amended Complaint, Wilson County has a written policy against nepotism set forth in the Wilson County Employee Handbook that "permits the employment of relatives," but provides "guidelines" to "reduce the possibility or perception of favoritism and avoid placing related staff in embarrassing positions."  (Docket No. 18, Second

1

Amended Complaint ¶ 13).[1] Notwithstanding that overall policy, and some other policies governing

certain departments (like the Solid Waste Department's stated intention to avoid favoritism and/or

nepotism), Plaintiffs allege that "[t]hese written polices are mere window dressing because in

practice Wilson County government officials routinely violate these policies with no consequences

and otherwise generally practice nepotism and favoritism as a mater of course." (Id. ¶ 15).

The Second Amended Complaint then goes on to assert various instances of alleged nepotism

and/or favoritism. Examples include: (1) the Finance Director (a) hiring his granddaughter, a fellow

church member, a County Commissioner, and the niece of another employee to work in the Finance

Department, and (b) hiring his secretary's son as an IT consultant; (2) the Property Assessor hiring

his wife to work for him in the Property Assessor's office; (3) a shift commander for the Wilson

County Emergency Management Agency hiring his daughter to work for him part-time and then full

time; (4) at least four County Commissioners, one Senior District Attorney, and a Judicial

Commissioner whose sons work or worked in the Sheriff's Department; (5) the County Clerk (a)

hiring both his daughter and a niece to work in the Clerk's Office, and (b) hiring the former Clerk

who, in turn hired his daughter to work in the Clerk's office; and (6) the Director of Solid Waste

creating the position of Recycling Coordinator so he could give the job to the wife of a friend. (Id.

¶ 15).

These are but some of the examples of alleged nepotism and favoritism in Wilson County

government, and Plaintiffs allege that "the nepotism, cronyism and favoritism" has "resulted in a

qualified, Black candidate being turned down for a job in favor of an unqualified, White relative or

---

[1] One such guideline provides that "[r]elated staff may not be assigned to positions where one relative may have the opportunity to check, process, review, approve, audit, or otherwise affect the work of another relative," and "[r]elated staff may not be assigned to positions where one relative might influence the salary progress or promotion of another." (Id.).

friend of a Wilson County government official or employee" on "at least two occasions." (Id. ¶ 16). This allegedly occurred when the Wilson County Commission in January 2006 voted to hire Stacy Swindell as a Judicial Commissioner instead of William Coggins ("Coggins"), even though Coggins had prior experience as a Judicial Commissioner, and even though Coggins was unanimously recommended for the position by the "Judicial Committee." (Id.). It also allegedly happened when Angela Lolanda, the sister of the former County Clerk, was hired to fill a vacated position in the Finance Department, even though Plaintiff Cedric Jennings ("Jennings") claims that he has "extensive experience in insurance matters" and "was going to apply for the job." (Id.).

Plaintiffs also contend that Wilson County does not regularly post any job openings in county government, and that, in the few instances where job are posted, they are only posted "in newspapers circulated within Wilson County." (Id. ¶ 17). Relying on Equal Employment Opportunity Commission surveys, Plaintiffs claim that during the fiscal years of June 2004 to 2007, only 10 positions were advertised in Wilson County, yet 145 people were hired into county jobs, meaning that "the other 135 positions must have been filled by referrals to friends, family, church members, and acquaintances of those existing County employees that knew of job openings." (Id. ¶ 20).

Plaintiffs further assert that "[e]ven if the African American community learns of a job opening within Wilson County government by 'word of mouth,' the prevailing opinion within the community is: don't bother – they won't hire you anyway" because "Wilson County has the reputation of not hiring African Americans." (Id. ¶ 25). This is purportedly evidenced by the fact that of the 415 employees in Wilson County government in 2007, only 29 were African American which "equates to a ratio of 7.4% African American[s] for full-time employees and 6.3% for other

than-fulltime employees," and most of those employees are in non-managerial and lesser paying jobs. (Id. ¶ 26). Additionally, for the fortunate few African American who are hired, "[t]he use of derogatory or disrespectful terms to refer to minorities is widespread within Wilson County government, even among the top echelons of the government." (Id. ¶ 28).

With respect to Plaintiffs' own experiences in seeking work in Wilson County, Jennings alleges that, apart from the un-advertised Finance Department job, he "is seeking full-time employment with benefits and would have applied for employment with Defendant had he ever known of any job openings." (Id. ¶ 5). Tartt alleges that, in mid- to late-December 2009, he went to the Wilson County landfill to apply for a job and was asked if he wanted to apply for an Animal Control position. Tartt filled out a job application submitted the same, with the belief that it would be considered for any available job. In fact, he claims he asked the employee who took his application whether it would be kept on file, and she allegedly told him, "I believe so," and that he was "assured by two people at the landfill that his application would be kept on file in case another position came open." (Id. ¶¶39-41, 55).

After hearing nothing about his application, Tartt called the landfill in mid-January 2009, and was told the animal control position had been filled "six months" ago (which would have been even before the job was posted in the local newspaper in August 2009), and was told there were no other positions available. (Id. ¶¶ 46-47). Nevertheless, a White male was hired that same day into an un-advertised position, and another individual was hired in the Solid Waste Department on April 27, 2009. (Id. ¶¶ 53, 55).[2]

---

[2] Plaintiffs claim that, based on evidence discovered in an unrelated discrimination case, Defendant undertook "efforts at covering up the Animal Control Officer situation," efforts that "go[] to the very top of Wilson County government." (Id. ¶ 62).

Based on the foregoing, Plaintiffs filed suit asserting violations of 42 U.S.C. §§ 1981 &

1983, as well as disparate treatment and disparate impact discrimination claims under Title VII of

the Civil Rights Act of 1964, 2000e, *et seq.* and the Tennessee Human Rights Act ("THRA"), Tenn.

Code Ann. § 4-21-101 *et seq.* They seek class certification solely with respect to their disparate

impact claims under Title VII and the THRA.

## II. LEGAL DISCUSSION

Plaintiffs seek to represent a class pursuant to Fed. R. Civ. P. 23(a) and (b)(2).[3] In opposing

class certification, Defendant argue that, not only do Plaintiffs not meet the prerequisites for

maintenance of a class action under Rule 23, Plaintiffs lack standing to pursue an action on behalf

of others.

### A. Standing

This Court's power to adjudicate is limited to "cases and controversies" under Article III.

U.S. Const., art. III, § 2, cl. 1. "[S]tanding is an essential and unchanging part of the

case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560

(1992). The Supreme Court has defined standing generally as "the question of . . . whether the

litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth

v. Seldin, 422 U.S. 490, 498 (1975). Further, "'no class may be certified that contains members

lacking Article III standing." Mazza v. American Honda Motor Co., Inc., ___ F.3d ___, ___, 2012

WL 89176 at *10 (9th Cir. Jan. 12, 2012) (quoting, Denney v. Deutsche Bank AG, 443 F.3d 253, 264

(2d Cir.2006)).

---

[3] In the Second Amended Complaint, Plaintiffs also claim they can represent a class under Fed. R.
Civ. P. 23(b)(3), but their Motion for Class Certification is based on 23(b)(2). Regardless, Plaintiffs' request
for class certification fails because they do not meet the requirement of Rule 23(a) which is a prerequisite to
both a Rule 23(b)(2) and Rule 23(b)(3) class.

Defendant argues Plaintiffs lack standing to bring this case because neither applied for an available job or was rejected as an applicant for a job. Specifically with respect to Tartt, Defendant asserts that "based upon the undisputed material facts," he "expressed interest and applied for a *single* position in Animal Control in December 2008; however, it is indisputable that the Wilson County Animal Control Department last had a vacant Animal Control Officer position in *July 2008*, approximately five (5) months *before* Tartt applied." (Docket No. 69 at 10, italics in original). In claiming that the foregoing are "undisputed material facts," Defendant goes far beyond the pleadings and relies on an affidavit and deposition testimony. However, "[i]n determining whether each Plaintiff's standing," a court "'must accept as true all material allegation of the complaint[.]'" Fednav, Ltd. v. Chester, 547 F.3d 607, 614 (6ᵗʰ Cir. 2008) (quoting, Warth v. Seldin, 422 U.S. 490, 501 (1975)).

In the Second Amended Complaint, Plaintiffs allege that Tartt filled out an application at the landfill for a job that was allegedly open, and was informed that it would be kept on file, not only for that job, but others as well. Plaintiff was told no jobs were open, but at around the same time frame that Plaintiff was seeking employment with Wilson County, two white males were hired at the landfill. This is enough to show that Tartt has a "case or controversy" regarding discrimination against Defendant, and he has standing.

Although Tartt has standing to pursue (but not necessarily prevail on) a failure to hire claim in his own right, it does not necessarily follow that Jennings has such standing, or that either Plaintiff has standing to represent a class relating to discriminatory post-hiring practices. This is because "determination of standing is both plaintiff – and provision – specific." Fednav, 547 F.3d at 614. "That one plaintiff has standing to assert a particular claim does not mean that all of them do." Id. (citing, Allen v. Wright, 468 U.S. 737, 752 (1984) ("the standing inquiry requires careful judicial

examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted").

Defendant argues Jennings lacks standing because he "cannot establish a *prima facie* case of discrimination" inasmuch as he "never applied for a job at Wilson County, nor did he testify that he was deterred from applying." (Docket No. 69 at 10). However, looking again at the Second Amended Complaint and accepting the allegations as true, Plaintiffs do allege that Jennings was qualified for and interested in a position in the Finance Department, and "potential applicants for employment are 'applicant for employment' for purposes of Title VII." United States v. Brennan, 650 F.3d 65, 126 (2nd Cir. 2011).

"For a non-applicant to have standing, 'courts look to whether a plaintiff has alleged facts that, taken as true, support the inference that it would have been futile for him to apply-not simply whether a plaintiff can allege a discriminatory practice." Wagner v. Pacific Maritime Ass'n, 2007 WL 2407093 at *7 (D. Or. Aug 21, 2007) (quoting, Wynn v. Nat'l Broadcasting Co., Inc., 234 F.Supp.2d 1067, 1099 (C.D. Cal.2002)). Here, the Second Amended Complaint is replete with allegations and anecdotal evidence which at least raise the inference that it would have been futile for Jennings to apply for a position in the Wilson County government because open positions go to relatives and friends of White Wilson County employees.

Although both Tartt and Jennings have made the preliminary showing necessary to pursue their individual claims and thereby arguably represent a class of thwarted and deterred job applicants, the same cannot be said with respect to post hiring practices. "'[I]t is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.'" Murray v. U.S. Bank Trust Nat'l Ass'n, 365

F.3d 1284, 1288 n.7 (11th Cir. 2004) (quoting, <u>Prado-Steiman *ex rel.* Prado v. Bush</u>, 221 F.3d 1266, 1280 (11th Cir. 2000)). "It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert." <u>Id</u>. "Rather, 'each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.'" <u>Id</u>. Neither Jennings or Tartt was ever employed by Wilson County, and, therefore, they are not in a position to represent Wilson County employees regarding alleged discriminatory post-hiring practice.[4]

**B.  Fed. R. Civ. P. 23**

"'The district court maintains substantial discretion in determining whether to certify a class, as it possesses the inherent power to manage and control its own pending litigation.'" <u>Beattie v. Century Tele. Inc.</u>, 511 F.3d 554, 559 (6th Cir. 2007). In exercising that discretion, the Court looks to Rule 23 of the Federal Rules of Civil Procedure which sets forth a two step process to determine the propriety of maintaining a class action. Representative Plaintiffs must first show that the factors under 23(a) have been met. Only then is the Court obligated to consider Rule 23(b). Fed. R. Civ. P. 23(b) ("A class action may be maintained if Rule 23(a) is satisfied and if . . .").

Under Rule 23(a), a party seeking class certification must show that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests

---

[4] The Court notes that even if Plaintiffs had standing to pursue class relief in relation to post-hiring practices, their request for class certification of that claim would be denied because, as explained below, Plaintiffs have fail to meet Rule 23(a)'s requirements.

of the class. Fed. R. Civ. P. 23(a). A trial court is required to conduct a "'rigorous analysis' of the issues necessary to show that the requirements of Rule 23(a) have been met." Reeb v. Ohio Dept. of Rehabilitation, 435 F.3d 639, 644 (6ᵗʰ Cir. 2006).

In determining whether Plaintiffs have satisfied the "rigorous" requirements for class certification, a court generally should accept a complaint's allegations as true, although "'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'" Pilgrim v. Universal Health Card, LLC, 660 F.3d 943, 949 (6ᵗʰ Cir. 2011) (quoting, Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982)). In fact, it is "frequently" the case "that 'rigorous analysis' will entail some overlap with the merits of plaintiff's underlying claim" and "[t]hat cannot be helped." Wal-Mart Stores, Inc. v. Dukes , 141 S.Ct. 2241, 2251 (2011).

### a. Numerosity

Under Rule 23 of the Federal Rules of Civil Procedure, a party seeking to convert a case to class action status must show that the putative class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." Bacon v. Honda of America, Mfg., Inc., 370 F.3d 565, 570 (6ᵗʰ Cir. 2004). Nevertheless, "'[t]here is no strict numerical test for determining impracticability of joinder," and "'impracticability of joinder must be positively shown, and cannot be speculative.'" Golden v. City of Columbus, 404 F.3d 950, 965-966 (6ᵗʰ Cir. 2005)(citation omitted).

In this case, Plaintiffs argue that "[a]lthough the exact number of potential class members is uncertain, such number would easily exceed 100" and there "is a potential class of over 10,000 African Americans in the Nashville Metropolitan Area" making joinder impracticable. (Docket No.

65 at 15).  In this regard, Plaintiffs posit:

> In the Nashville Economic Region, as defined by the Nashville Chamber of Commerce, the African American population is 15.2%.  Out of a total civilian labor force for the same Nashville MSA region of 787,389, this equates to an African American labor force within the Nashville MSA of almost 120,000.  With 9.1% unemployment, there are 71,446 unemployed workers actively looking for work in the civilian labor force of which 15.2%, or 10,860 are African American. This does not include those African Americans who are employed but seeking work with better pay and benefits.

(Id.).

It requires many leaps to arrive at the conclusion that Plaintiffs' statistics suggest a potential class of over 10,000 applicants or deterred applicants.  To begin with, the Nashville Economic Region consists of ten separate counties, and, considered as a region, the figures for individual counties such as Wilson County may be skewed because Davidson County (which includes Nashville) contains over one-third of the entire population base.  Further, it does not follow (1) that all of the individuals encompassed within the unemployment figures are "actively looking" for work in the civilian labor force; (2) that those who are actively seeking work in the civilian labor force are looking for work in Wilson County; (3) that those who are actively seeking work in Wilson County are looking for work in the Wilson County government; (4) or that those who are actively seeking work with the Wilson County government are qualified for an available position.

In disparate impact cases (which is the only claim Plaintiffs seek to pursue as a class), "[t]he proper comparison is between the racial composition of the at-issue jobs and the racial composition of the qualified population in the relevant labor market." Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 650-51 (1989), yet present Plaintiffs' statistics do nothing to establish the proper comparison.  In this regard, Plaintiffs' attempt to establish numerosity is not unlike the attempt in Golden where plaintiff Golden sought to represent a class consisting of tenants in Columbus whose

water service had been or would be terminated by the city because of the landlord's or prior tenant's

indebtedness. In affirming the district court's denial of class certification, the Sixth Circuit wrote:

> . . . As proof of impracticability of joinder, Golden relies exclusively on one figure – the number of renters in Columbus, which, according to Golden, is 150,000. We have no reason to question this figure but we agree with the district court that merely referring to it does not suffice for purposes of proving numerosity under Rule 23(a)(1). Golden must offer something more than bare speculation to link the gravamen of her claim for liability to the class of individuals she purports to represent. The gravamen of Golden's equal protection claim is that the City irrationally terminates certain tenants' water service. Golden does not allege that all tenants in Columbus are at risk of constitutional harm, only those whose predecessors or landlords are indebted to the City. Thus, reference to the total number of tenants in Columbus is not probative of the number of tenants reasonably likely to face the harm for which Golden seeks redress. Of course, the total number of tenants in Columbus is probative in the very limited sense that it represents the absolute maximum number of plaintiffs that could be in any class action brought by a tenant against the City. But the district court must engage in a "rigorous analysis" when evaluating the plaintiff's proof of numerosity . . .[.] We cannot say the district court abused its discretion in concluding that such an unrefined measure as the total tenant population in Columbus is too speculative for purposes of the numerosity requirement.

Golden, 404 F.3d at 966.

Likewise in this case, the 10,860 figure is probative "only in the very limited sense that it

represents the maximum number of plaintiffs that could be in any class action" brought by Plaintiffs

against Wilson County. Contrast that with the fact that, even though this case was filed more than

two years ago, Plaintiffs have yet to formally identify anybody but themselves as potential class

members. A class of two, or course, will not do.

### b. Commonality and Typicality[5]

---

[5] The Court considers these two factors together because "[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Gen. Tel., 457 U.S. at 157 n. 13.

The second prerequisite to class certification is that "there be questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality was at the very core of the decision in Dukes where the Supreme Court observed that there must be "some glue" that holds the adverse employment decisions together:

> Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury[. . . .]" This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. *Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor.* That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

Dukes, 131 S.Ct. at 2251 (italics added, citation omitted).

The third prerequisite – typicality – "is designed 'to limit the class claims to those fairly encompassed by the named plaintiff's claims.'" Bacon, 370 F.3d at 572 (citation omitted). "In order to meet the typicality requirement, the plaintiffs must show that their 'injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff.'" Id. Hence, "[a] necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." In re American Medical Systems, Inc., 75 F.3d 1069, 1082 (6th Cir. 1996).

Plaintiffs argue that their discrimination claims pose common and typical question of law and fact, specifically:

Does Wilson County have a policy or practice of cronyism, favoritism or nepotism where word-of-mouth recruitment by a predominantly white work-force to predominately white friends and family has a disparate impact on African American by not allowing them an equal opportunity to compete for such jobs on an equal basis without regard to the color of their skin?

(Docket No. 65 at 22). Plaintiffs also argue that their "claims and the claims of the class are based on the same course of conduct engaged in by Defendant Wilson County[.]" (Id.).

In Dukes, the Supreme Court noted that "'[c]onceptually is there is a wide gap between (a) an individual's claim that he has been [subjected to discrimination], and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who may have suffered the same injury as that individual such that the individual's claim and the class claim will share questions of law of fact and that the individual's claim will be typical of the class claim." Dukes. 131 S.Ct. 2553. The gap may be bridge only with "significant proof" that the employer "operated under a general policy of discrimination." Id. Such proof is lacking in this case.

According to the evidence before the Court, there is no central or standardized process for employment decision in Wilson County, and, in fact there is no countywide human resource department. (Docket No. 72, Gilbert Decl. ¶ 4). Instead, the Wilson County government contains numerous departments whose department heads may be elected or appointed. Each department head has "substantial autonomy in running his/her department within the confines of the budget," and "are responsible for making hiring, firing and placement decisions within their department." Id.

Moreover, the types of county jobs are varied, running the gamut from jail officers to road deputies to nurses, to roadway workers, to firefighters to paramedics to clerical workers to animal control officers. Obviously, the variety of jobs necessarily means that the qualifications for the position will be varied as well. It also means that individual comparison will have to be made *vis-a-*

*vis* the applicants and the positions sought.  See, Bacon, 370 F.3d at 571 ("We view with skepticism

a class that encompasses 1) both workers and supervisors; 2) production-line workers and those in

administrative positions; 3) workers in four plants with different production capabilities; and 4)

workers and supervisors spread over more than 30 departments.  Because class members have such

different jobs, we find it difficult to envisage a common policy regarding promotion that would

affect them all in the same manner").

The fact that there are numerous departments and a whole host of different jobs also indicates

that it is unlikely that the claims of deterred applicants (assuming there is anyone other than

Jennings) could "productively be litigated at once."  Whether any putative class member was, in

fact, deterred from applying and/or the basis for that deterrence would require individual fact-

finding, but a class action is not an efficient method of adjudication where individual inquiries

predominate.  See, Pipefitters Local, 654 F.3d at 631 ("Given the necessary number of individual

inquiries, a class action cannot be a superior form of adjudication"); Elizabeth M. v. Montenez, 458

F.3d 779, 787 (8th Cir. 2006) ("The presence of a common legal theory does not establish typicality

when proof of a violation requires individualized inquiry").

### d.  Adequacy of Representation

The final Rule 23(a) prerequisite requires Plaintiffs show that they "will fairly and

adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "This requires that the class

representatives exercise some oversight of the class counsel so as to avoid simply turning the

conduct of the case over to the class counsel."  Olden v. Gardner, 294 Fed. Appx. 210, 220 (6th Cir.

2008).

In this case Defendant has identified discovery that raises questions as to Plaintiffs' ability

14

to adequately represent the interest of the class. First, it points to evidence which arguably suggests that Plaintiffs' individual claims may not survive summary judgment – Tartt because he allegedly applied only for an Animal Control Position which was not available, and Jennings because, during deposition testimony, he could only assert a vague desire to secure fulltime employment generally, and not necessarily with Wilson County. The Court is not prejudging the merits of either Plaintiffs' case, but the question remains whether either may be in the case for the long haul and therefore share the same interests of putative class members.

Second and more troubling, Defendant has pointed to evidence which could suggest that neither Plaintiff was interested in employment in Wilson County government of his own volition. Both Plaintiffs were represented by present counsel in earlier cases in this court, <u>see</u>, <u>Jennings v. ProLabor Serv., Inc.</u>, Docket No. 3:09-00292 (M.D. Tenn. 2009) and <u>Hullett v. Tartt</u>, Docket No. 3:06-1070 (M.D. Tenn. 2006), raising the possibility that this prior association (as opposed to actual aggrievement) is the real reason for the existence of this litigation.

During the course of his direct examination deposition testimony, Jennings could not recall where he heard about the Finance Department job, and could only state that he had some sort of general desire to apply "to any job that's going to better myself" . . . "whether it be in Wilson, Rutherford or any other county." (Docket No. 70-6, Jennings Depo. at 65-67).[6] Jennings' "efforts" in looking for the next best thing, do not "adequacy of representation" make. For his part, Tartt admitted during his deposition that he applied for the Animal Control position at the suggestion of his counsel. (Docket No. 70-1, Tartt Depo. at 50-51).

---

[6] During the course of redirect examination, Jennings recalled that his own counsel had spoken to him about applying for a job in Wilson County, but Jennings could not remember the title of the job or any specifics. (<u>Id</u>. at 72).

"Class representatives are expected to protect the interests of the class." Olden, 294 Fed. Appx. 220. Plaintiffs have not shown that they will adequately protect the interests of individuals who were truly subjected to discrimination at the hands of Wilson County, assuming such individuals exist.

### III. CONCLUSION

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Dukes, at 2250 (citation omitted). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common question of law or fact, *etc.*" Id. at 2251. Plaintiffs have failed in this task and their Motion for Class Certification will be denied.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE